**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1007-23

STATE OF NEW JERSEY,

Plaintiff-Respondent,

v.

CLEVE W. LEWIS,

Defendant-Appellant.

---

Submitted May 19, 2026 – Decided July 29, 2026

Before Judges Sumners, Susswein and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 20-01-0103.

Kelly Anderson Smith LLC, attorney for appellant (Kelly Anderson Smith, of counsel and on the briefs).

Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Kimberly P. Will, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Cleve W. Lewis appeals his March 10, 2023 jury trial convictions for knowing/purposeful murder, first-degree conspiracy to commit murder, second-degree possession of a weapon for an unlawful purpose, second-degree burglary, and second-degree certain persons not to have weapons, stemming from the 2019 fatal shooting of Derrick Harris. The State alleged that defendant, along with codefendants Gregory Coombs[1] and Deontray Gross, conspired to kill Harris for financial gain.

Following the issuance of the indictment, Gross entered into a cooperation agreement with the State and gave evidence against defendant and Coombs at their joint trial. Gross testified that he, defendant, and Coombs planned to go to Harris's apartment and shoot him. Defendant was the shooter, and Coombs drove the getaway vehicle.

On appeal, defendant argues that the court erred in: (1) refusing to suppress the evidence obtained from his cell phone; (2) failing to grant his motion to suppress evidence obtained following a motor vehicle stop; (3) failing to grant his motion for severance; (4) instructing the jury; and (5) refusing to

---

[1] Defendant and Coombs were tried together. Coombs challenges his jury trial conviction in a separate appeal, State v. Coombs, No. A-1006-23 (App. Div. July 29, 2026). Although there are overlapping issues, because defendant and Coombs make different arguments, we issue separate opinions.

exclude data obtained through programs such as Geotime, Cellebrite, and Graykey. Alternatively, defendant argues that the cumulative errors committed by the trial court denied him a fair trial and resulted in manifest injustice. After reviewing the record in light of the governing legal principles, we affirm.

I.

We discern the following pertinent facts and procedural history from the record.[2]

A. The Crime and Police Investigation

Shortly after midnight on November 7, 2019, police responded to the Delsea Gardens Apartments in Millville to investigate a reported homicide at the victim's apartment. Upon arrival, police observed a deceased male, later identified as Harris, lying face down in a pool of blood a few steps in from the front door of the unit. Police also observed several bullet strikes.

Police encountered two adults in the apartment, Shante Brooks and Rashan Rodgers, who were brought to the Millville police station to be interviewed. Brooks, who was Harris's girlfriend and testified at the joint trial, told police that she and Harris had a daughter and all three of them lived in the

---

[2] Because our harmless error analysis requires us to evaluate the overall strength of the State's case, we recite the relevant facts elicited at trial in some detail.

apartment. She revealed that Harris was involved with "drugs" and had been incarcerated in the past. She also stated that Gross was Harris's "best friend" and had been to their apartment "several times."

Brooks said that she, Harris, their daughter, and Rodgers had been in the unit since 5:00 p.m. on the night of the shooting. At approximately 8:00 p.m., there was a knock on their front door. No one was expecting visitors, so no one answered the door.

A couple of hours later, at approximately 11:00 p.m., Brooks said that there was a second knock on the door. Harris went downstairs to answer the door, and Brooks stayed in the bedroom and looked out the window. The window was directly over the front door, but because of an overhang, Brooks could not see who was standing there. She did, however, observe that the person was wearing Nike Foamposite sneakers. Brooks heard Harris open the door, which was immediately followed by the sound of multiple gunshots.

After the shooting stopped, Brooks went halfway down the stairs to ensure the shooter was no longer there. She saw Harris on the floor and went back upstairs to contact her aunt and instruct her to call 9-1-1.

Because the Millville Police Department had remote access to the surveillance system at Delsea Gardens, police were able to review footage while

A-1007-23

still on scene using their mobile devices. The footage—which was shown to the jury at trial—showed two subjects entering Delsea Gardens through a fence on the north side of the property and walking to Harris's unit. One of the subjects then opened fire, and both were seen fleeing back through the fence where they had entered and into a large, black SUV.

After reviewing this footage, police canvassed the area and spoke to an individual who resided next door to Delsea Gardens at the Millville Motor Lodge. Based on the information provided by the witness, in addition to the information already gathered from the footage, police began to look for a large, black SUV, and specifically, a newer model SUV, possibly a Ford Expedition or a Chevy Suburban.

Shortly thereafter, an officer reported that he was pursuing a vehicle that matched that description—specifically, a black Ford Expedition that appeared to be a newer model. After confirming the vehicle being followed was a newer model, the officer was instructed by his superiors to pull the vehicle over. Two males were inside. Coombs was the driver, and Gross was the passenger. Having learned from Brooks that Gross was friends with Harris, police brought both men to the Millville police station for interviews, and the vehicle was impounded for further examination.

A-1007-23

Back at Delsea Gardens, police seized multiple .40 caliber Smith & Wesson casings and projectiles. They also observed and photographed a shoe print in blood. They did not find any fingerprints.

Police also searched the SUV and collected several items, including an Enterprise rental agreement, a black jacket, a latex glove, a cell phone, and Coombs's license. The latex glove, which was discolored, was found on the passenger side of the vehicle in the front door pocket. Police also removed the infotainment center,[3] which included a navigation system.

Both Coombs and Gross were taken into custody, and police collected their clothing as well as Gross's phone, checking it for incoming and outgoing calls, text messages, and Wi-Fi network connections. Police discovered that at the time of the incident, Gross's phone had connected to Harris's Wi-Fi network.

Police also examined data collected from the infotainment system in the SUV. With this data, investigators were able to determine the route of the SUV around the time of the shooting. The navigation data indicated that the SUV

---

[3] An infotainment center in a vehicle is a digital interface that combines information and entertainment functions. It typically includes features such as navigation, audio playback, communication, and smartphone integration, allowing drivers to access global positioning system (GPS) directions, music, and phone calls easily through a central display. Michell Erickson, What is the Infotainment System in a Car: Ultimate Guide, Car Awareness (July 21, 2025), https://carawareness.com/what-is-the-infotainment-system-in-a-car/.

A-1007-23

turned into Delsea Gardens at 11:09 p.m. and left at 11:12 p.m. It then turned into the Millville Motor Lodge and departed at 11:21 p.m. From there, the SUV traveled to an apartment complex in Seabrook and arrived at 11:46 p.m. It then travelled to the Vineland Village Apartments, arriving at 12:16 a.m. and leaving at 12:39 a.m. It exited Vineland Village at 12:39 a.m., returned at 12:42 a.m., and then departed for a second time at 12:47 a.m. At 1:10 a.m., the SUV returned to Delsea Gardens. It left at 1:18 a.m., which was when police began to follow it.

Police also obtained Coombs's and Gross's Facebook records, and investigators discovered messages between Gross and defendant from shortly before the shooting. Specifically, around 7:00 p.m. on the evening of the incident, Gross said that he wanted defendant to drink with him, stating, "I'm out here. You popping this bottle with me?" Defendant responded and told Gross to "pull up."

Police examined defendant's public Facebook profile and obtained his phone number and his address, which was the same as Coombs's. On defendant's Facebook profile, investigators saw images of a sneaker collection which appeared to include Nike Foamposite sneakers. Later, investigators discovered this picture had been removed from his profile.

A-1007-23

On December 5, 2019, police searched Coombs's residence. Defendant was present, and investigators also found a certificate in a bedroom bearing defendant's name, suggesting he resided there. Police also found a press release relating to Harris's murder in the kitchen.

While at Coombs's residence, investigators also spoke with Gerrell Black, who lived with Coombs. She told investigators that Coombs was her child's father. She also confirmed that defendant, who was Coombs's cousin, lived with her and Coombs on occasion, and was living with them at the time of Harris's murder.

Meanwhile, several items that were found in the SUV were sent for further testing, including the jacket and latex glove. Both tested positive for blood. While no particular DNA profile could be determined from the sample taken from the jacket, a DNA profile was obtained from the latex glove. Only defendant was a match.

Police also reviewed Coombs's jail call logs between November 7, 2019, and November 15, 2019, and discovered several calls placed to a phone number associated with defendant.

On December 17, 2019, defendant was arrested and charged along with Coombs and Gross. At that time, his cell phone was seized and searched. Police

discovered a web search related to DNA on latex gloves. Police also found a November 4, 2019, Facebook message from defendant to Coombs in which defendant stated that he had a new "toy."

## B. Additional Witness Testimony

On February 19, 2020, Gross gave a formal cooperation interview to members of the prosecutor's office, after which he pled guilty to conspiracy to commit murder. Gross also testified at defendant and Coombs's joint trial. Gross testified that he and Harris had known each other since they were kids and had been "best friends." Gross would visit Harris at his apartment, and when he did so, he would connect to his Wi-Fi.

Gross admitted that he and Harris were involved in criminal activity together, and that in 2018, they broke into the home of a friend of theirs, "Chuck," and stole "almost a hundred thousand dollars." Gross believed that Chuck knew he and Harris had stolen from him.

Gross was also friends with defendant, as the two "grew up together," but prior to the night of Harris's murder, Gross did not know Coombs. Gross confirmed that around the time of the incident, defendant, who had previously been living with his girlfriend, was staying with Coombs because he and his girlfriend were arguing.

9

On the day of the murder, Gross bought a bottle of liquor to celebrate a family friend's release from prison, but that family friend was in Delaware, so Gross contacted defendant instead. He then went to Coombs's house to meet with defendant. Coombs was there as well, and Gross testified that was the first time he met Coombs. Gross further testified that when he entered the house, there were two guns on the kitchen table. As the three were drinking, Coombs made a comment indicating he was aware that Gross had stolen money from Chuck.[4] That statement gave Gross pause, because he had never met Coombs before and was unsure how he knew about the theft of Chuck's money. Gross had also heard that Chuck had a bounty out on him and Harris.

Gross stepped outside to think about how to leave, and defendant and Coombs followed him outside. Defendant pointed a gun at Gross, and Coombs told Gross to do whatever defendant said. Defendant then told Gross to get in Coombs's vehicle, which was a big, black, newer SUV.

Gross testified that Coombs then drove himself and defendant to Gross's house. Gross was instructed to go inside and change his shoes, which were brightly colored, and he was told that if he continued to do as they said, he would

---

[4] Specifically, Gross testified that Coombs referred to Gross as "the one that hit the lick," meaning the one that "robbed somebody or came up on some money or whatever."

be okay. Gross then went inside, changed into green Nike Foamposite sneakers, and grabbed clear gloves and drugs that he had stashed. In the SUV, there was a conversation about what was going to happen next: the plan was for Gross to knock on the door to Harris's house, defendant to "handl[e] his business," and Coombs to stay in the vehicle and be the driver. At the time, Gross believed Coombs and defendant intended to rob Harris, and he was unable to remember at what point he realized the plan was to shoot Harris.

After leaving his house, Gross, Coombs, and defendant drove to the motel that was next door to Delsea Gardens. Gross then explained to defendant and Coombs where exactly in the Delsea Gardens apartment complex Harris lived. Gross and defendant then got out of the vehicle and walked from the motel to Delsea Gardens through a hole in the fence that separated the two properties. The two went up to Harris's apartment and knocked on the door while Coombs remained in the SUV. At trial, Gross was shown the surveillance footage and identified himself and defendant at Harris's door. Gross testified that defendant wore purple Nike Foamposite sneakers and a black hooded sweatshirt, and that defendant also had on latex gloves and was holding one of the guns that Gross had seen earlier at Coombs's house.

After knocking on the door, Gross walked away, as Harris's house was

11

dark and he did not think that anyone was home. No one answered the door, and Gross and defendant returned to the SUV.

Gross, Coombs, and defendant then drove around the area for some time, and Gross assumed that Coombs and defendant were looking for Chuck. Eventually, they returned to the motel next to Delsea Gardens. Like before, Coombs stayed in the SUV and Gross and defendant got out and walked over to Harris's apartment, passing through the hole in the fence. Gross knocked on Harris's door, and believing no one was home, he turned and walked away. At that moment, Gross heard gunshots. He thought defendant shot at the closed door, as he did not see it open or see anyone else there. Gross said he heard "a lot" of shots and did not hear any return fire. Gross and defendant ran back through the hole in the fence and into the SUV, where Coombs was waiting.

The three men drove back to Coombs's house to drop defendant off. According to Gross, during the drive, defendant and Coombs discussed their plan to split a $50,000 bounty, and defendant confirmed that Harris was dead.

Before getting out of the SUV, defendant took off the latex gloves and left them in the car. Coombs ordered Gross to stay in the SUV and told Gross that he would take him home. After they arrived at his house, Gross went inside to change, but he insisted to Coombs that he needed to go back to Delsea Gardens

A-1007-23

and check on Harris. Coombs drove Gross back to Delsea Gardens, which Gross believed he agreed to do because he wanted to watch Gross and make sure he did not speak to police.

When they entered Delsea Gardens, they saw a substantial police presence, and Coombs immediately exited the apartment complex. As they left, they noticed a police car following them. Shortly thereafter, they were pulled over and Gross was arrested. Gross testified that Coombs told him not to say anything to the police. Gross complied because he was afraid that defendant would harm his family if he cooperated with police.

Defendant's mother, Loretta Lee, also testified at trial as an alibi witness for the defense. She claimed that she was with defendant at his home on the night of the shooting and arrived at 10:20 p.m. On cross-examination, the State elicited testimony from Lee that, contrary to her trial testimony, she told police and a defense investigator that she arrived at defendant's house at 9:00 or 9:30 p.m. When confronted with additional inconsistencies between her testimony and her prior statements to police and the defense investigator, Lee became hostile and refused to answer additional questions.

A-1007-23

## C. Indictment, Conviction, and Sentencing

On January 29, 2020, defendant was charged by indictment with knowing/purposeful murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a) (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count three); second-degree burglary, N.J.S.A. 2C:18-2(a)(1) (count four); first-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(j) (count five); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count six). Coombs and Gross were also charged with counts one, two, and four.

Prior to trial, defendant filed a motion to suppress evidence obtained from his cell phone following the issuance of both a general search warrant and a Communications Data Warrant (CDW). The trial court denied defendant's motion. Defendant and Coombs also filed a motion to suppress evidence acquired as a result of the motor vehicle stop, which was also denied. Additionally, defendant and Coombs filed two motions to sever their joint trial, both of which the trial court denied.

Defendant and Coombs were jointly tried before a jury over the course of twenty-two non-consecutive days between January and March 2023. On March

14

10, 2023, the jury found defendant guilty of knowing/purposeful murder, first-degree conspiracy to commit murder, second-degree possession of a weapon for an unlawful purpose, second-degree burglary, and second-degree certain persons not to have weapons. Count five was dismissed following a motion by the State.

Defendant was sentenced to a forty-eight-year term of imprisonment on count one, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Counts two and three were merged into count one. On count four, defendant was sentenced to a ten-year term of imprisonment, subject to NERA, to run concurrently with count one. Finally, on count six, defendant was sentenced to a ten-year term of imprisonment with a five-year period of parole ineligibility, also to run concurrently with count one.

This appeal followed. Defendant raises the following contentions for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS (EVIDENCE) THE SEARCHES OF DEFENDANT'S [I]PHONE AS BEING UNREASONABLE AND BEYOND THE SCOPE OF THE SUPPORTING AFFIDAVIT AND CDW[.]

15

POINT II

THE TRIAL COURT IMPROPERLY DENIED DEFENDANT'S SUPPRESSION MOTION AS POLICE WERE WITHOUT REASONABLE SUSPICION JUSTIFYING THE STOP OF THE MOTOR VEHICLE OPERATED BY DEFENDANTS[.]

POINT III

THE TRIAL COURT'S FAILURE TO SEVER CODEFENDANTS CAUSED IRREPARABLE HARM AND PREJUDICE TO THE DEFENDANT[.]

POINT IV

THE TRIAL COURT'S INSUFFICIENT AND IMPROPER INSTRUCTIONS AND JURY CHARGES DENIED DEFENDANT A FAIR AND IMPARTIAL TRIAL[.]

POINT V

DEFENDANT'S TRIAL WAS [IRREPARABLY] PREJUDICED WHEN THE COURT FAILED TO EXCLUDE INFOTAINMENT DATA COLLECTED BY GEOTIME, CELLEBRITE AND GRAYKEY PROGRAMS[.]

POINT VI

THE CUMULATIVE [ERRORS] COMMITTED BY THE TRIAL COURT DENIED THE DEFENDANT A FAIR TRIAL AND RESULTED IN A MANIFEST INJUSTICE[.]

## II.

We first address defendant's contention that the trial court erred in denying his motion to suppress evidence obtained from his cell phone. Defendant argues that the search was "unreasonable" and "beyond the scope of the supporting affidavit and CDW." Specifically, defendant argues that the supporting affidavit and CDW authorized communications only, such as texts and emails, and did not authorize either a web search history or full forensic examination.

We begin our analysis by acknowledging the legal principles governing our review. "As a general matter, '[o]ur standard of review on a motion to suppress is deferential.'" State v. Courtney, 478 N.J. Super. 81, 90 (App. Div.), cert. denied, 257 N.J. 413 (2024) (alteration in original) (quoting State v. Nyema, 249 N.J. 509, 526 (2022)). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." Ibid. (alteration in original) (quoting State v. Ahmad, 246 N.J. 592, 609 (2021)).

We likewise owe substantial deference to the warrant-issuing court's finding of probable cause. "[A]n appellate court's role is not to determine anew whether there was probable cause for issuance of the warrant, but rather, whether

there is evidence to support the finding made by the warrant-issuing judge." State v. Hamlett, 449 N.J. Super. 159, 169-70 (App. Div. 2017) (alteration in original) (quoting State v. Chippero, 201 N.J. 14, 20-21 (2009)). "Doubt as to the validity of the warrant 'should ordinarily be resolved by sustaining the search.'" Ibid. (quoting State v. Keyes, 184 N.J. 541, 554 (2005)).

In contrast to the deference afforded to a trial court's factual findings, an appellate court reviews legal conclusions de novo. State v. S.S., 229 N.J. 360, 380 (2017).

Turning to substantive principles, the Fourth Amendment to the United States Constitution and the New Jersey Constitution protect citizens against unreasonable searches and seizures. Specifically, Article I, Paragraph 7 of the New Jersey Constitution provides that "no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized." A finding of probable cause for issuance of a warrant requires "a fair probability that contraband or evidence of a crime will be found in a particular place." Chippero, 201 N.J. at 28 (quoting United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993)). "[T]he probable cause determination must be . . . based on the information contained within the four corners of the supporting affidavit, as

A-1007-23

supplemented by sworn testimony before the issuing judge that is recorded contemporaneously." Schneider v. Simonini, 163 N.J. 336, 362 (2000). Because a search warrant "enjoys a presumption of validity," a "defendant challenging the validity of a search warrant bears the burden of proving 'there was no probable cause supporting the issuance of the warrant.'" State v. Missak, 476 N.J. Super. 302, 317 (App. Div. 2023) (quoting State v. Jones, 179 N.J. 377, 388 (2004)).

Here, the trial court found that there was sufficient probable cause provided in the affidavit to support the search of defendant's cell phone and further concluded that the entire search of the phone was not overly broad. The court reasoned:

> With regard to the probable cause argument . . . , I find that there was more than sufficient probable cause for the search of this phone as outlined in the four corners of the affidavit . . . for the purposes of [the warrant Judge's] execution of the [o]rder. So, I'm going to make it very clear that . . . there is clearly probable cause for the search or the dump of that phone.
>
> With regard to the information, dumping the entire contents of the phone, I do not find that that's overly broad. We're not talking about a situation here where we're looking for a motorcycle under somebody's bed. The information that could be contained within a cell phone relevant to a homicide investigation could be a plethora of things including location information, including communications with others who might be

19

identified as sources of other information relevant to . . . the crime, and in this particular case, evidence such . . . as was extracted. Search information that when combined with other evidence that was seized at the time of the arrest or the search of the . . . vehicle, which included the latex gloves, ties those gloves to the other information . . . already in the investigation, including the blood evidence and including the surveillance evidence that places the vehicle near or at the location where the homicide occurred.

So, all of these things, these individual little pieces of information, are relevant to each other. But, there's no way police in advance could even know of that. So, when you're talking about the scope of a search of something like the contents of a phone, it's not overly broad because there could be so many things in there, so many types of things in there that police do not have to list all, every possible idea that might be relevant—or found within a phone relevant to an investigation. The thing that's relevant is the search of the phone.

So, the search of the phone itself is not in and of itself overly broad. And the information, to my understanding, that we're talking about here is the information that was obtained from inside the phone itself, the requested search history from inside the phone. It was part of a data dump.

We agree that there was sufficient probable cause to justify the search of defendant's cell phone, and that the search of the phone's contents was not overly broad in these circumstances.

Because defendant relies heavily on our decision in <u>Missak</u>, 476 N.J. Super. at 302,[5] we deem it appropriate to analyze that case closely. In <u>Missak</u>, the State alleged that the defendant used online chatting applications to communicate with an individual he believed was a fourteen-year-old girl, soliciting the child's agreement to meet him for a sexual encounter, and traveling to an agreed-upon location to perform sex acts with her. <u>Id.</u> at 307. When the defendant arrived at the location, he discovered that his online communications had been with an undercover law enforcement officer. <u>Ibid.</u> He was arrested and his cell phone was seized. <u>Ibid.</u> The State obtained a search warrant for the phone's contents and moved for an order compelling the defendant to provide the phone's passcode. <u>Ibid.</u> The defendant cross-moved to quash the search warrant, arguing it authorized an unconstitutional general search of the phone by allowing access to information for which no probable cause to search was established in the warrant.

---

[5] We note that on March 16, 2026, our Supreme Court granted leave to appeal our subsequent, unpublished opinion in <u>Missak</u> following a remand. <u>See</u> <u>State v. Missak</u>, No. A-2602-23 (App. Div. Sept. 3, 2025) (slip op. at 2-4), <u>certif. granted</u>, 263 N.J. 321 (2026).

On appeal, we agreed with the defendant, finding the "warrant's authorization for the State to search all of the phone's contents, information, and data" was not supported by probable cause, concluding:

> [The officer]'s certification expressly sought a search warrant for evidence pertaining only to the crimes of luring and attempted sexual assault defendant allegedly committed on December 8 and 9, 2021. The facts [the officer] relied on to establish probable cause to believe the phone contained evidence of those crimes are limited to defendant's alleged use of a phone to message [the officer] during the commission of the crimes on December 8 and 9, 2021.
>
> Those facts established probable cause to believe the phone found in defendant's possession contained some evidence of the crimes charged. And defendant does not dispute [the officer]'s certification established probable cause permitting a search of the phone's contents and data limited to the text communications between defendant and [the officer], posing as a juvenile, allegedly exchanged through [two] applications on December 8 and 9, 2021, and any alleged phone communications between defendant and [the officer] on those two days.
>
> [Id. at 319-20.]

In sum, we determined that probable cause had not been established to support law enforcement's search of the entire phone in question, but instead only for the communications between the defendant and the undercover law enforcement officer. Id. at 320-22.

22

Here, in stark contrast to the facts in <u>Missak</u>, investigators had probable cause to believe that defendant, Gross, and Coombs were involved in a conspiracy to commit murder and that defendant's cell phone contained a variety of evidence related to the planned homicide.  As Detective Calixto stated in his certification in support of the warrant:  "It has been proven over time [] that individuals who engage in criminal activity, such as homicides, often used cellular devices to contact people to help, hide, destroy or conceal either himself or herself or evidence from law enforcement."

Accordingly, unlike the investigators in <u>Missak</u>, the investigators here had foundational knowledge regarding the extent of the crime, and therefore, their request to search defendant's entire cell phone was reasonable and supported by probable cause.  We emphasize that the search warrant was supported by a detailed affidavit, which explained why the investigators had probable cause to believe that defendant was involved in the murder of Harris and why a wide range of data stored on his cell phone might contain relevant evidence.  Stated another way, the affidavit provided ample probable cause to believe that the phone would contain evidence stored throughout the phone's memory.

That brings us to defendant's argument that only "communications" such as texts or emails were authorized to be searched, and that web search history

23

was outside the scope of the CDW.  We are aware of no authority that stands for the proposition that electronically stored information can only be accessed if it relates to communications, such as texts or emails.  Here, in any event, police obtained both a CDW and a regular search warrant.  We are thus satisfied that police in this case obtained prior judicial authorization, based upon ample probable cause, to search the phone for stored data pertaining to the conspiracy to commit murder—i.e., the planning and commission of the murder, as well as efforts to conceal or destroy evidence of the crime, including web search history before and after the murder.

## III.

We next address defendant's argument that there was no reasonable suspicion justifying the stop of the motor vehicle operated by Coombs and Gross, and thus, the court erred in denying defendant's suppression motion.

## A.

To begin, we reiterate that "[o]ur standard of review on a motion to suppress is deferential."  Courtney, 478 N.J. Super. at 90 (alteration in original) (quoting Nyema, 249 N.J. at 526).  "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the

24

record."  Ibid. (alteration in original) (quoting Ahmad, 246 N.J. at 609).  Legal conclusions are reviewed de novo.  S.S., 229 N.J. 360, 380 (2017).

"A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions."  State v. Dunbar, 229 N.J. 521, 532 (2017).  "To be lawful, an automobile stop 'must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed.'"  State v. Bacome, 228 N.J. 94, 103 (2017) (quoting State v. Carty, 170 N.J. 632, 639-40, modified on other grounds, 174 N.J. 351 (2002)).

In determining whether an investigative detention is justified under the reasonable suspicion standard, "a court must consider 'the totality of the circumstances—the whole picture.'"  State v. Stovall, 170 N.J. 346, 361 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).  Furthermore, reasonable suspicion "requires 'some minimal level of objective justification for making the stop.'"  State v. Amelio, 197 N.J. 207, 211-12 (2008) (quoting State v. Nishina, 175 N.J. 502, 511 (2003)); see also State v. Scriven, 226 N.J. 20, 34 (2016) ("[R]aw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop.").  "Although a mere hunch does not create reasonable suspicion, the level of suspicion required is considerably less than proof of

A-1007-23

wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." State v. Gamble, 218 N.J. 412, 428 (2014) (internal quotation marks and citations omitted).

Additionally, reasonable suspicion analysis takes into account "the officers' background and training, and permits them 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" State v. Nelson, 237 N.J. 540, 555 (2019) (additional internal quotation marks omitted) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)); see also Stovall, 170 N.J. at 363 ("It is fundamental to a totality of the circumstances analysis of whether reasonable suspicion exists that courts may consider the experience and knowledge of law enforcement officers.").

"Although reasonable suspicion is a less demanding standard than probable cause, '[n]either "inarticulate hunches" nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights.'" Nyema, 249 N.J. at 527 (alteration in original) (quoting Stovall, 170 N.J. at 372 (Coleman, J., concurring in part and dissenting in part)).

26

"Determining whether reasonable and articulable suspicion exists . . . is a highly fact-intensive inquiry that demands evaluation of 'the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.'" Id. at 528 (quoting State v. Privott, 203 N.J. 16, 25-26 (2010)).

B.

On appeal, defendant argues, as he did below, that the trial court improperly denied his suppression motion "as police were without reasonable suspicion justifying the stop of the motor vehicle" operated by Coombs and Gross.

Prior to trial, the court held a testimonial hearing on defendant's suppression motion, joined by Coombs, during which several law enforcement officers testified about their investigation following the shooting at Delsea Gardens.

Detective Miguel Martinez recounted arriving at the scene and interviewing a witness who resided next door to Delsea Gardens at the Millville Motor Lodge. The witness told Martinez that he observed a "huge," dark-colored, "newer model" SUV make three separate visits to Delsea Gardens that

evening. Each time, several individuals exited the SUV, walked toward the apartment complex, and then returned to the SUV, which left the parking lot. The witness told Martinez that this happened around 8:00 p.m., again around 9:00 p.m., and a third time around 11:20 p.m. Martinez relayed this information to other officers.

Sergeant Brandon Kavanagh also testified at the hearing. He arrived at Delsea Gardens about an hour after the shooting and learned that police suspected that a large, dark-colored SUV may have been involved in the incident. At 1:18 a.m., Kavanagh saw a vehicle matching that description leave Delsea Gardens. Kavanagh followed the vehicle, a new Ford Expedition, based "on a hunch" that it may have been involved in the shooting. There were not many other vehicles on the road at that time. Kavanagh followed the vehicle to a nearby bar and parked across the street to observe. He saw the front seat passenger, a Black male, get out of the vehicle and walk into the bar. After a few minutes, the male walked out of the bar and back into the vehicle. The vehicle then pulled out of the parking lot of the bar and continued down the road.

As he followed, Kavanagh received an update from Lieutenant George Chopek, who informed Kavanagh that the suspect vehicle was "a large black SUV, somewhat shiny, Ford Expedition or Chevy Suburban style." Kavanagh

28

immediately reported back that he was following a vehicle that matched that description, and at approximately 1:30 a.m., at Chopek's direction, he initiated a motor vehicle stop. When asked by the prosecutor why he stopped the vehicle, Kavanagh testified that he initially followed it because it was a "large dark colored SUV," and then "after I talked to Lieutenant Chopek and he informed me that it was shiny, or somewhat clean SUV, we determined that maybe I should stop it and find out who the occupants were inside of it."

Following oral argument, the court held:

> The stop of the vehicle, the decision made by Lt. Chopek to make an investigative stop of that vehicle was reasonable.
>
> That was a reasonable decision predicated upon the information available to law enforcement at the time. They had a description of the vehicle. And some of the factors here, the description of the Delsea Gardens Apartments is a high-crime area. The time in which this vehicle was leaving is after 1 o'clock in the morning. So it's not mid-day. This is -- this vehicle was being operated at a time of night in a high-crime area, matching the description of a vehicle that was associated with a homicide earlier that evening, an hour or so prior. It was absolutely appropriate that that vehicle be stopped at that point in time. It would have been a dereliction of their duty as investigators of this offense to allow that vehicle to leave uninvestigated. It is simply -- there are too many factors that would require police investigation of that vehicle.

A-1007-23

We agree with the trial court that the record demonstrates several factors amounting to reasonable suspicion justifying the stop of the vehicle in these circumstances.

The SUV matched a specific description—a large, black, new/shiny Ford Expedition or Chevy Suburban—which was based on the credible testimony of the witness who observed the vehicle three separate times that evening. Furthermore, Kavanagh observed the vehicle driving near the scene of the incident, a high-crime area, in the middle of the night when few other cars were on the road. Finally, Kavanagh observed Gross exit the passenger seat at the bar, and the officers knew that they were looking for more than one suspect based on surveillance footage and the witness's testimony. Importantly, Kavanagh was not the only officer who made the decision to stop the vehicle.

Although Kavanagh used the term "hunch," that referred to the initial decision to follow the vehicle. It is well established that reasonable suspicion is not needed to follow a vehicle. See Michigan v. Chesternut, 486 U.S. 567, 575 (1988) (holding that police do not seize a suspect by merely following them without activating their siren/lights or otherwise directing the suspect to stop); State in Int. of C.B., 315 N.J. Super. 567, 572 (App. Div. 1998) ("[P]olice do not effectuate a [Fourth Amendment] stop simply by . . . following a person in

30

a police vehicle." (citations omitted)). Rather, the reasonable suspicion requirement arises at the moment that police communicate to the driver of the subject vehicle to pull over. The record clearly demonstrates that by the time the decision was made to initiate a stop, police had reasonable suspicion to believe the vehicle was involved in criminal activity based not only on Kavanagh's own observations, but information communicated to him by other officers investigating the recent murder.

In sum, evaluation of the totality of the circumstances leading to the motor vehicle stop supports the trial court's determination that the stop was justified based on multiple factors amounting to reasonable suspicion. We see no reason to disturb that finding.

IV.

We next address defendant's argument that the court's "failure to sever codefendants caused irreparable harm and prejudice to the defendant."

Once again we begin our analysis by acknowledging the legal principles that govern defendant's claim. Two or more defendants may be charged and tried jointly "if they are alleged to have participated in the same act or transaction" constituting the offense. R. 3:7-7. "Indeed, under those circumstances, a joint trial is 'preferable' because it serves judicial economy,

31

avoids inconsistent verdicts, and allows for a 'more accurate assessment of relative culpability.'" State v. Weaver, 219 N.J. 131, 148 (2014) (quoting State v. Brown, 118 N.J. 595, 605 (1990)).

However, "[i]f, for any reason, it appears that a defendant . . . is prejudiced by the joint trial, the trial court may sever." Id. at 148-49 (citing R. 3:15-2(b)). "The decision to sever is within the trial court's discretion, and it will be reversed only if it constitutes an abuse of discretion." Id. at 149. "[I]n deciding whether to grant a severance the trial court must balance the possible prejudice to the defendant against the government's interest in judicial economy and must consider the ways in which it can lessen the prejudice by other means . . . ." State v. Morant, 241 N.J. Super. 121, 134 (App. Div. 1990) (quoting State v. Barrett, 220 N.J. Super. 308, 311 (Law Div. 1987)). "[I]f by proper instructions and charges to the jury the separate status of codefendants can be maintained, the 'danger by association' which inheres in all joint trials is effectively overcome." Ibid. (quoting Barrett, 220 N.J. Super. at 311).

Separate trials are required when codefendants present defenses that "are not simply at odds, but are 'antagonistic at their core,' meaning that they are mutually exclusive and the jury could believe only one of them." Weaver, 219 N.J. at 149 (quoting Brown, 118 N.J. at 606). It is not enough to show "[t]he

mere existence of hostility, conflict, or antagonism between defendants." Brown, 118 N.J. at 606. Defenses are mutually exclusive if they "force the jury to choose between the defendants' conflicting accounts and to find only one defendant guilty." Ibid. More specifically:

> If the jury can return a verdict against one or both defendants by believing neither, or believing portions of both, or, indeed, believing both completely, the defenses are not mutually exclusive. Defenses that do not demand that the jury choose one or the other in order to return a verdict, though clearly in conflict and antagonistic, are not mutually exclusive.
>
> [Ibid.]

Moreover, "[t]he fact that one defendant seeks to escape conviction by placing guilt on his or her codefendant has not been considered sufficient grounds for severance." Ibid.

Following oral argument on defendant and Coombs's motion to sever, the trial court held:

> I agree with the State, there's little or no prejudice with regard to the joint [trial] and I am, after many years of doing this confident the jurors know how to sever, sift out between evidence of -- by one that doesn't apply to another. Jurors are actually very good at that.
>
> In the end, however, the decision with regard to this was made initially by the Prosecution when they indicted them together. The Prosecution wants to try these matters together. Judicial economy says it is far

33

more expeditious to do it in one trial than in two. And the evidence -- there is different evidence against each of these defendants, but there is evidence against both and those -- that evidence can be -- in one trial without prejudicing the other, particularly if there's going to be any testimony from the co-defendant, will be available for cross-examination, there's . . . no issue there, either.

So in the end, there's absolutely no reason to sever it and I'm going to deny the motion. And so, we're going to go forward with that.

Defendant maintains that in a recorded jail phone call, "Coombs gave a statement that inculpated [defendant]," and for that reason, their trials should have been severed. The record shows, however, that no such recordings were admitted at trial, just the mere fact that phone calls were placed. Thus, there was no admitted statement by Coombs that went against the interests of defendant as to implicate the concerns raised in Bruton v. United States, 393 U.S. 123 (1968).

Defendant further argues that "[s]ince severance was denied, the jury was confused by the cumulative amount of evidence relating to other defendants. Evidence against the other defendants caused 'spillover' into defendant's case; notwithstanding jury instructions."

While it can hardly be disputed that a substantial amount of evidence was presented at the twenty-two-day trial, nothing in the record suggests that the jury

34

was confused by what it heard and saw. The State's theory of the case was relatively simple: defendant, Coombs, and Gross concocted a plan to murder Harris, Coombs drove the getaway vehicle, Gross navigated the men to the scene, and defendant was the shooter. Gross agreed to cooperate with the State and provided testimony regarding the conspiracy and how the three men carried out their plan. In sum, there is nothing in the record to show that the joinder of defendant's and Coombs's cases confused the jury as to the facts and the respective roles played by the conspirators.

We likewise reject defendant's claim that his motion for severance should have been granted because he and Coombs's defenses were "antagonistic at their core." As we have noted, to require severance, the defenses must be "mutually exclusive and the jury could only believe one of them." Weaver, 219 N.J. at 149. That is not the case here. The record shows that defendant's and Coombs's defenses did not compel the jury to believe one of them at the expense of the other in order to reach a verdict. See Brown, 118 N.J. at 606. The jury could have found only defendant at fault, only Coombs at fault, both of them at fault, or neither of them at fault. In these circumstances, denial of defendants' severance motions was entirely proper.

35

V.

We next address defendant's contention that the trial court gave "insufficient and improper instructions," which "denied defendant a fair and impartial trial." Specifically, defendant maintains that the court "suggest[ed] to jurors" that he was guilty of the charged offenses by including his name rather than using the term "co-conspirator." We find no error in the trial court's instructions.

A.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). In charging a jury, a "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). "[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error." State v. Jenkins, 178 N.J. 347, 361 (2004). "The test to be applied . . . is whether the charge as a whole is misleading, or sets forth

accurately and fairly the controlling principles of law." Baum, 224 N.J. at 159 (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

"[A] jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'" State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) (quoting State v. R.B., 183 N.J. 308, 325 (2005)). "Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." State v. Concepcion, 111 N.J. 373, 379 (1988). "However, there is no principle requiring that in every case a court must deliver a specifically tailored instruction relating the facts of the case to the applicable law." State v. T.C., 347 N.J. Super. 219, 240 (App. Div. 2002).

B.

In its instructions regarding accomplice liability, the court stated, in relevant part:

> The State contends that [] Gregory Coombs is legally responsible for the alleged criminal conduct of Cleve Lewis or another person for the death of Derrick Harris and that . . . the alleged burglary of [the victim's apartment in] Delsea Gardens . . . on November 6 of 2019.
>
> . . . .

A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of an offense.

A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of the offense, he solicits such other person to commit it or aids, or agrees, or attempts to aid such other person in planning or committing it.

. . . .

In this case the State alleges that the defendant Gregory Coombs is equally guilty of the crimes committed by Cleve Lewis or another person, because he acted as his accomplice by soliciting, or aiding, or agreeing, or attempting to aid Cleve Lewis or that other person in planning or committing it with the purpose that the specific crime charged be committed.

In order for you to find that Gregory Coombs is guilty of the specific crime charged, the State must prove beyond a reasonable doubt each of these following elements. Number one, that Cleve Lewis or the person that caused the death of Derrick Harris committed a crime of murder and burglary as I have already explained the elements of those offenses to you.

Later, in its instructions regarding vicarious liability, the court stated, in relevant part:

The indictment charges the defendant Gregory -- Coombs with the crime of murder. The State does not allege that the defendant committed the crime . . . personally, but rather that he is legally accountable for that crime even though it was committed by another.

38

More specifically, the State alleges that the crime . . . was committed by Cleve Lewis or another co-conspirator and that the defendant is legally accountable for the crime of murder committed by Cleve Lewis or another co-conspirator because Gregory Coombs, Cleve Lewis, and others . . . allegedly conspired together to commit that crime. That is why I have already defined the crime of murder and conspiracy for you.

If you are satisfied beyond a reasonable doubt that the State has proven all of these essential elements that Cleve Lewis or another co-conspirator committed the crime of murder, then you must go on to determine the guilt or innocence of Gregory Coombs or Cleve Lewis for that same crime.

However, if you are not satisfied beyond a reasonable doubt that -- that Cleve Lewis or another co-conspirator committed the crime of murder, then your inquiry ends here and you must return a verdict of not guilty as to Gregory Coombs. Therefore, the following instructions on conspiracy are only for your use if you find beyond a reasonable doubt that Cleve Lewis or another co-conspirator committed the crime of murder.

. . . .

Our law provides that a person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

A person is legally accountable for the conduct of another person when he is engaged in a conspiracy with such other person and the conduct is within the scope of that conspiracy.

A-1007-23

Thus, you must decide whether Gregory Coombs engaged in a conspiracy with Cleve Lewis or another co-conspirator to commit the crime of murder.

. . . .

Thus, for the purposes of this case, to find that the defendant . . . engaged in a conspiracy with . . . Cleve Lewis or another you must be satisfied beyond a reasonable doubt of the following elements. That defendant agreed with Cleve Lewis or another; and that when the defendant so agreed with Cleve Lewis or another, the defendant's purpose, that is his conscious object, was to promote or to make it easier for Cleve Lewis or another to commit the crime of murder.

In this case, after consideration of all of the evidence, if you find beyond a reasonable doubt that Cleve Lewis or another . . . co-conspirator committed the crime of murder, and also that the defendant conspired with Cleve Lewis or another co-conspirator to commit that crime, then you must find the defendant guilty of the crime of murder. On the other hand, if you have a reasonable doubt that . . . Cleve Lewis or another co-conspirator committed the crime of murder, that Gregory Coombs conspired with Cleve Lewis or another co-conspirator to commit that crime, or both, then you must find the defendant not guilty.

Defendant argues that the court "intimated [his] guilt in its jury instructions." Specifically, defendant maintains that "[t]he inclusion of [his] name and actions in the definition of the solicitation suggested [his] guilt to the jurors," and the court "should have just referred to 'co-conspirator.'"

We note that the court followed the model jury instructions for "Liability for Another's Conduct (N.J.S.A. 2C:2-6(c)(1)(c)), Accomplice—Legal Duty" and "Conspiracy—Vicarious Liability (N.J.S.A. 2C:2-6(b)(4))" completely. It bears emphasis that a jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is "comprehensive and thorough." R.B., 183 N.J. at 325; see also State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) (explaining that "[w]hen a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered'" (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000))); cf. Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 466 (2000) ("It is difficult to find that a charge that follows the Model Charge so closely constitutes plain error.").

More specifically, as to the instruction on accomplice liability, the model jury charges explicitly provides: "The indictment charges (OR The State alleges) that the defendant is legally responsible for the criminal conduct of X." Model Jury Charges (Criminal), "Liability for Another's Conduct (N.J.S.A. 2C:2-6(c)(1)(c)), Accomplice—Legal Duty" (approved June 7, 2021). "'X' can be a named person or an unknown person." Ibid. (emphasis added). Here, the prosecution's theory was that defendant was the shooter and Coombs was the

41

driver of the getaway vehicle. The State did not present any evidence to suggest that Coombs was the shooter. We are satisfied that the trial court correctly molded the instructions to fit the evidence that was presented.

As to the instruction on vicarious liability, the model jury charge leaves blank spaces for the court to include the names of the alleged perpetrators and offenses. For example, the first paragraph of the model jury charges provides:

> Count _____ of the indictment charges the defendant with the crime of _____. The State does not allege that the defendant committed the crime of _____ _____ personally, but rather that he/she is legally accountable for that crime even though it was committed by another. More specifically, the State alleges that the crime of _____ was committed by _____, and that the defendant is legally accountable for the crime of _____ committed by _____ _____ because the defendant and _____ _____ allegedly conspired together to commit that crime. It is therefore necessary that I instruct you as to both the crime of _____ and the law of conspiracy.
>
> [Model Jury Charges (Criminal), "Conspiracy - Vicarious Liability (N.J.S.A. 2C:2-6(b)(4))" (approved Oct. 17, 1988).]

We reiterate that the State presented evidence that defendant, Coombs, and Gross conspired to murder Harris. The prosecution's theory was that defendant was the one who shot Harris, Gross was the one who led the men to

Harris's location, and Coombs drove the getaway vehicle. In view of the State's evidence, the trial court appropriately filled in the blanks in the model jury charge.

## VI.

We next turn to defendant's contention that his "trial was irreparably prejudiced when the court failed to exclude infotainment data collected by Geotime, Cellebrite, and Graykey programs." We begin by noting that "a trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484, (1997)). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting Marrero, 148 N.J. at 484 (internal quotation marks and citations omitted)).

## A.

The State proffered digital evidence obtained using three software technologies: Geotime, Cellebrite, and Graykey.

43

The Geotime evidence was presented over defense counsel's objection that the State needed to supply expert testimony regarding the scientific basis and reliability of the global positioning system (GPS)-data collection device in the vehicle and the Geotime software that compiled it.

Investigator Thomas Chang of the New Jersey State Police testified that he received "GPS coordinates, latitude, longitudes, date and times" from Detective Calixto that had been extracted from the infotainment system of the rental SUV. Chang entered this GPS data into the Geotime software to create a map of the SUV's route from November 6, 2019, to November 7, 2019. During his testimony, Chang placed the SUV in various locations from Delsea Gardens to the surrounding area that generally matched the State's allegations regarding the location of the SUV.

Prior to Chang's testimony, the trial court conducted a Frye[6] hearing on admissibility of the Geotime software utilized by Chang. According to Chang's testimony at the hearing, the raw data extracted from the vehicle was provided to him on an Excel spreadsheet. Chang further explained, "[t]he software that I use works with coordinates and it maps everything . . . on a Google-style map,

---

[6] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

the geography map." Chang testified that he could have created the map manually using the same GPS coordinates, but that would have been more time consuming.

Chang testified that he had received two eight-hour trainings along with "[a]bout [fifteen] online courses" regarding the operation of the Geotime software. He could not attest to the reliability of the data, the manner in which it was collected, or the software. Chang was unaware of any peer-reviewed articles about the software he was using and had no knowledge of the system limitations of the devices involved or of scientific studies regarding their reliability.

Following the hearing, the trial court concluded that expert testimony was not needed to explain the Geotime software to the jury. The court explained,

> while it's impressive, this is not rocket science, okay? This is just about taking data and putting the points on a map. Whether they're accurate or not depends on the GPS technology which . . . I find is fundamentally reliable. And this is just recording that information on a map. As long as he operates it correctly, and he's been trained to do that, I do not find that that is the type of technology that the [c]ourt would require a great deal of explanation on because it's fairly basic.
>
> . . . .
>
> So GPS location technology is generally reliable. The manufacturer of the vehicle has an interest to make sure

A-1007-23

that the units they're using are . . . reasonably accurate, and the GeoTime system this -- this individual has been properly trained to operate. And its ultimate function is not so complex that would require further examination by the [c]ourt. It's just plotting.

Graykey and Cellebrite

The State also presented Detective Kyle MacDonald to testify as to his use of Graykey and Cellbrite to extract and interpret data from defendant's phone. The trial court conducted another Frye hearing outside the presence of the jury prior to his testimony. According to MacDonald's testimony at the hearing, Graykey serves two functions: (1) it guesses the password of the phone to be searched or bypasses the password, and (2) it copies the files on the phone onto a hard drive. The copied files consist of incomprehensible letters and numbers, which Cellebrite transforms into a readable format.

MacDonald is a certified forensic computer examiner testified that he had used Cellebrite for over nine years. According to his testimony, he had had the opportunity to verify its accuracy by checking its results against data on unlocked phones. He testified that both Graykey and Cellebrite were commonly used and relied upon by police departments.

46

The trial court found that MacDonald's testimony regarding Graykey and Cellebrite was admissible, over defense counsel's objection. With respect to Graykey the court explained,

> the Frye application with regard to Gray[k]ey is [kind of] counterintuitive. How could the Court ever determine that you can't rely upon it if it gets you in the phone? And it got him in the phone. So how could I find that that is not reliable? But the fact that law enforcement generally relies upon that particular device with regard to iPhones, it demonstrates to the Court that there is sufficient reliability with regard to that because they were able to open the phone ultimately, and open the entire phone.

Turning to Cellebrite, the court made the following findings:

> But as far as Cellebrite, it is generally relied upon, particularly here in New Jersey, by law enforcement, and the state police use it.
>
> . . . .
>
> So generally speaking, the Cellebrite technology I find is reliable. It is independently verifiable by comparing the phone once you get access to the phone.
>
> . . . .
>
> But again, it is the type of technology that is generally relied upon by law enforcement as generally reliable. So from the standpoint of the [Frye] application, it would generate generally reliable or trustworthy results.

47

The trial court thus concluded that expert testimony was not required for either program, and further found that MacDonald was sufficiently trained in both to testify as a lay witness to what he observed when using those programs.

<u>Cell Tower Location Testimony</u>[7]

Investigator Chang also testified to "call" and tower-location data provided from the use of Graykey and Cellebrite. The trial court held a <u>Rule</u> 104 hearing outside the presence of the jury to determine the admissibility of this testimony. Both defense counsels did not raise any objections to this testimony following the hearing; however, the court expressed the following concerns:

> THE COURT: Is this the proper witness to be giving testimony about cell tower data? Has he been qualified as an expert?
>
> [THE STATE]: No, Your Honor.
>
> THE COURT: All he can say is he got this data and he plugged it into the program. That's okay. But what that data means, that's something completely different, isn't it? This is exactly what I was talking about a few minutes ago. This is different than doing a data dump out of a cellphone and taking its reported coordinates just like the infotainment system.

---

[7] Defendant does not raise the issue asserted by co-defendant Coombs that this testimony was precluded based on our Supreme Court's ruling in <u>State v. Hannah</u>, 263 N.J. 411 (2026). However, we think it appropriate to analyze that issue.

. . . .

> THE COURT: This witness is trying to give, or is attempting to give expert testimony without being qualified as an expert when it comes to cell tower location technology. Cell tower location technology is different. We're talking about . . . not quadrants, sectors, three sectors. Now, I've heard this testimony more than once before. I think I have a fairly good understanding of how it works. But I have heard nothing to indicate that this individual should be considered an expert in the generation of the data. He may be able to interpret the data through his system. That's fine. But the data itself and the admissibility of the data is the other question. Now, I do know through previous experiences here that particularly down in this area there are a couple of cell towers that have a couple issues with regard to distances, okay? And so far what I've heard from him is accurate, but he's simply not qualified as an expert to give that kind of testimony, and that's my problem.

The court concluded that Chang's testimony should be limited to tower location, explaining,

> at best what he can do, and I don't know what he's plotted in his report, he can indicate what cell tower the data says it hit off of and where the cell tower is located. But as for the exact location of the phone, without an actual expert testifying about . . . how they could figure out where that is, not going to permit that.

Defendant's counsel then requested that the trial court allow cross-examination regarding the distance between certain addresses to bolster defendant's purported alibi that he was at home with his mother at the time of the shooting.

A-1007-23

Defense counsel stated, "[t]he report also alludes to distances from one point to another. Can he be cross examined with regard to distances?" The trial court permitted the requested cross-examination.

Chang testified before the jury as follows:

> Q  Did you receive data about calls and when they took place?
>
> A  Yes, I did.
>
> Q  And what was the date and time range for this data?
>
> A  The data provided was from 9:19 [p.m.] through 9:44 [p.m.], November 6, 2019.
>
> Q  And who was the phone carrier?
>
> A  T-Mobile.
>
> Q  And what was your methodology for your analysis, sir?
>
> A  It was . . . to provide a visual display of the call events where . . . in the State of New Jersey the . . . phone calls are connected with . . . cellular antennas.
>
> Q  Okay. And were you able to locate a location for the tower?
>
> A  Yes.
>
> Q  And where was the location of the tower generally? In what town or area?

A    . . . Fairfield Township.

. . . .

Q    Okay.  If you look on page [twelve], it indicated that there was another call that took place later.  Just looking for the time of that call.

A    Okay.  So . . . that last call that I did -- that I did mention at 9:44 and [twenty-eight] seconds [p.m.] . . . that call lasted [sixteen] minutes and [forty] seconds.  With that it would have ended at 10:01 [p.m.]

Q    And was there an address that you were interested in comparing that phone number to?

A    As far as the location of –

Q    Yes, sir.

A    Where this phone -- where the –

Q    The tower was.

A    It was along Fairton-Gouldtown Road.

Q    So the tower was located at Fairton –

A    Yes, and if I remember working in this area that was right at the Fairfield Township municipal building.  So . . . right behind it was the cell tower.

Q    And did you compare the location of the tower to another address?

A    Yes, to the one that was in Upper Deerfield Township, Seabrook.

A-1007-23

Q     And what was the address for this, sir?

A     That was First Avenue.  1107 First Avenue, Seabrook, New Jersey.

Q     And would you happen to know, in miles, how far they are?

A     Not . . . off hand.  Not . . . an exact mile.

Q     Was it something that you noted in your report?

A     [I] have a time.  On page six of my report I have a line of sight distance and that's 7.5 miles.

Q     And if you were driving do you have a rest of the distance from driving?

A     Yes, I do.  Depending on the route you took, I showed three of them. . . .  [T]he most direct one was 8.7 miles, [sixteen] minutes; one was 9.4 miles, [eighteen] minutes; and . . . the third one was 9.4 miles, [seventeen] minutes.

On cross-examination defense counsel elicited the following testimony intended to bolster defendant's alibi:

Q     Okay.  How about the . . . distance of [sixteen] miles.  Did you calculate a time off the Google Maps from the tower to 1107 First Avenue?

A     [Sixteen] minutes you mean?  It's -- the [sixteen] minutes is 8.7 miles.  There's no [sixteen] miles anywhere.

Q      You're right. Yeah. I stand corrected. Right. The second alternative was 8.7 miles. That would have taken [sixteen] minutes?

A      Yes.

Q      So then the time of arrival would be -- correct me if I'm wrong -- about 10:16 [p.m.] if the person left right away.

A      Give or take a minute, yes.

Q      Right. And the third alternative was [eighteen] minutes. So it's a couple minutes over that. Over the last time.

A      Yes.

Q      Okay. So all in all . . . it would have been possible . . .to travel from the tower to the 1107 in about a half hour.

A      Sure. I don't see why not.

In closing, defense counsel argued that alibi witness Lee's testimony that she was with defendant at his home on the evening of the shooting fit the timeline established by Chang's testimony:

And, about . . . Loretta Lee, her assertion to [Detective Calixto] that she was there between ten and one, that time interval. So, what . . . Chang has to do is to get [the] cell tower information of . . . where her phone was and how far it would have been from her location to the 1107, in that time and see if it was feasible. In fact it was feasible.

A-1007-23

During summation, the State told the jury that Chang's testimony concerned information gathered "from Ms. Lee's alleged phone number, about where that phone was pinging on November 6, 2019." In closing, the State argued that Chang's testimony discredited defendant's alibi that he was with his mother on the night of the shooting, stating:

> She can't account for November 6th, because she wasn't with Mr. Lewis. And, she realized it up there. And, we know from Investigator Chang her phone was nowhere near that house. The last call ended at 10:01, and then all of a sudden she shows up to -- yesterday on the stand and says I remember when I got there. It was 10:20 p.m. exactly, on the dot. But, do you remember Investigator Chang's testimony when [defense counsel] asked him to do that math? How long would it take her to get there? Oh, about 10:19 she -- they would have gotten there. That's very convenient that she makes up 10:20. But, you learned that she never remembered the time when she told investigators previously.

## B.

The gravamen of defendant's argument is that the reliability of these programs should have been tested under the Daubert[8] standard, as the Supreme Court in State v. Olenowski, 253 N.J. 133 (2023), determined that standard, not the Frye test, applies in criminal cases. A similar argument was presented to the trial court following our Supreme Court's decision in Olenowski. The trial court

---

[8] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

rejected defendant's claim that the GPS data collected from the SUV's infotainment system should be evaluated under the Daubert standard. The court reasoned that, given the nature of the GPS technology involved, it would not make a difference whether the Frye or Daubert standard was applied. We agree with the trial court's ultimate conclusion that application of the Daubert standard was not required in these circumstances.

Preliminarily, Olenowski was decided four days after the trial court made its decision regarding the contested programs in this case; therefore, it does not apply because its holding is not retroactive. See id. at 154 ("Nothing in [this Court's] decision disturbs prior rulings that were based on the Frye standard. Future challenges in criminal cases that address the admissibility of new types of evidence should be assessed under the new standard."); State v. Lee __ N.J., ___ (2026) ("Olenowski I acknowledged the existence of prior rulings based on the Frye standard and declined to disturb them.").

Furthermore, both Chang and MacDonald testified as lay, not expert, witnesses. Thus, even if the holding in Olenowski did apply, an examination of the Daubert factors would not be necessary to introduce evidence concerning the use of Geotime, Graykey, and Cellebrite because the admissibility of the officers' respective testimony regarding these technologies is not contingent

upon satisfying expert witness standards.  See E&H Steel Corp. v. PSEG Fossil, LLC, 455 N.J. Super. 12, 26 (App. Div. 2018) ("New Jersey law does not mandate that lay testimony, and even lay opinion testimony, based on scientific, technical, or other specialized knowledge, automatically triggers the need for compliance with the rules for admissibility of expert testimony.").  Generally, "[a] fact witness is one who testifies as to what 'he or she perceived through one or more of the senses[,]'" State v. Miller, 449 N.J. Super. 460, 470 (App. Div. 2017) (quoting State v. McLean, 205 N.J. 438, 460 (2011)), rev'd on other grounds, 237 N.J. 15 (2019), and whose testimony consists of "a description of what the [person] did and saw" based on "first-hand knowledge." Ibid. (quoting McLean, 205 N.J. at 460).  This differs from an expert witness, who testifies based upon scientific, technical, or other specialized knowledge . . . that is beyond the understanding of the average person.  Ibid. (internal quotation marks and citations omitted).

Police officers may "testify in a variety of roles." Id. at 470.  They may testify as fact witnesses if their testimony "does not convey information about what the officer 'believed,' 'thought,' or 'suspected.'"  Ibid. (quoting McLean, 205 N.J. at 460).  Officers may also testify as lay witnesses where their testimony is "'based on their personal observations and their long experience in

areas where expert testimony might otherwise be deemed necessary.'" Id. at 471 (quoting State v. LaBrutto, 114 N.J. 187, 198 (1989)).

Here, as the trial court correctly determined, Chang and MacDonald were able to testify as lay witnesses regarding their use of Geotime, Graykey, and Cellebrite because their testimony was limited to what they "directly perceived" by virtue of their use of those programs. State v. Hyman, 451 N.J. Super. 429, 442 (App. Div. 2017) (quoting McLean, 205 N.J. at 460 ("[U]nlike expert opinions, lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay.")).

We recognize that expert testimony may be required where the accuracy or trustworthiness of the evidence can be called into question. See State v. Martini, 160 N.J. 248, 263 (1999). However, the GPS data in this case was corroborated by surveillance videos and law enforcement's observations of the SUV. For example, Kavanagh testified that he observed the SUV leave Delsea Gardens and head to a nearby bar at about 1:18 am. The GPS coordinates indicate that the SUV turned into the bar at 1:19 a.m., and video surveillance shows Gross at the bar at about 1:20 a.m. In these circumstances, expert testimony was not required, and the testimony of the State's witnesses was not subject to the rules governing the admissibility of expert testimony.

C.

However, our inquiry does not end there. We conclude that the admission of Chang's testimony regarding cell-tower location information was improper in light of our Supreme Court's recent decision in Hannah, 263 N.J. at 411.[9]

In Hannah, the Supreme Court was specifically concerned with cell site location information (CSLI). In that case, the State presented lay witness testimony from the investigating detective who told jurors that defendant was inside the victim's vehicle because his phone pinged off of cell towers a certain number of miles from the car's known location and the phone continued to ping towers on a path correlating to the route of the car. 263 N.J. at 418. In summation, the prosecutor told the jury that "a cell phone must be close to the tower it connects to, stating that its proximity must be 'a stone's throw' away." Ibid. The Court concluded that such testimony was improperly admitted and should have been "presented by a witness qualified as an expert pursuant to N.J.R.E. 702 because the technical aspects of CSLI are beyond the ken of the average juror." Id. at 442.

---

[9] Co-defendant Coombs raised this issue in supplemental briefing. Although defendant did not raise this issue on appeal, given that these cases were tried together we deem it appropriate to address it here.

A-1007-23

In particular, the Court was concerned with the "intricacies and nuances of cell towers" to glean location information. Id. at 445. As the Court explained, "[t]he relevance of CSLI can be understood by a jury only when it has a better grasp of how cell towers and cell phones interact. This requires an understanding of cell tower sectors, direction, and maximum coverage range, and the many factors, such as terrain and topography, that impact whether a cell phone connects to the closest tower or to one that is farther away." Ibid. The Court drew a bright line rule with respect to CSLI, rejecting the trial court's attempts to distinguish between CSLI testimony simply presenting information regarding tower locations, and the technical aspects of how the towers operate. See id. at 442.

In rejecting the State's argument, the Court explained,

> [t]he State argued that any layperson, including members of the jury, can determine and plot locations of cell towers by using the towers' longitude and latitude provided in the records and inputting those numbers into an internet mapping application. Although a jury may be able to figure out the location of cell towers using phone records, it would not be able to draw any meaningful inferences from that information without an understanding of how cell towers operate and why those cell tower locations matter. And, in the absence of expert guidance, a jury could attribute more or less weight to the tower locations than is warranted.

[Id. at 445.]

In sum, the Court concluded that for juries to understand the interaction between the cell phone and the tower, expert testimony is required.

We conclude that Chang's testimony regarding CSLI was impermissible in light of Hannah. The Hannah Court clearly rejected attempts to distinguish between CSLI testimony regarding tower locations, and the technical aspects of how the towers operate. See 263 N.J. at 442. Chang's testimony regarding the distance between tower locations and certain addresses is precisely what the Hannah Court cautioned against and determined required expert testimony. See id. at 445 ("[I]n the absence of expert guidance, a jury could attribute more or less weight to the tower locations than is warranted.").

Accordingly, we hold that, while the trial court did not err in permitting Chang and MacDonald to testify regarding their use of Geotime, Graykey, and Cellebrite, Chang's testimony regarding cell tower location information was impermissible under the Hannah framework.

D.

We must next address whether, in these circumstances, permitting testimony regarding CSLI without expert testimony requires reversal.

60

"A trial error is defined as an 'error which occurred during the presentation of the case to the jury,' and therefore may 'be quantitatively assessed in the context of other evidence presented in order to determine whether it was harmless beyond a reasonable doubt.'" State v. Camacho, 218 N.J. 533, 547 (2014) (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)). "When we consider whether a given error is harmless, that error 'must be evaluated in light of the overall strength of the State's case.'" State v. Allen, 254 N.J. 530, 550 (2023) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)). "[I]n appeals involving the erroneous admission of improper police officer lay testimony, the nature and extent of the admitted testimony is balanced against the strength of the prosecution's case beyond that testimony in determining whether the court's error requires a new trial." Ibid. Likewise, admission of evidence that should have been presented through expert testimony may still be considered harmless. See, e.g., State v. Derry, 250 N.J. 611, 634 (2022) (concluding that although the officer's testimony was improperly admitted as lay opinion testimony and may not have satisfied the requirements for expert testimony, the error was harmless given the overwhelming evidence against defendants).

Balancing the error against the strength of the State's case, we find that the admission of the investigator's testimony related to CSLI was harmless

A-1007-23

beyond a reasonable doubt. Unlike <u>Hannah</u>, the tower location testimony in this case was used to discredit an alibi witness, not to establish defendant's location at a particular time. The record demonstrates that the alibi witness' credibility was already impeached by her own inconsistent testimony at trial. Indeed, even defense counsel conceded that Lee "was not a very good witness" particularly because she gave an inconsistent account of what time she was purportedly with defendant.

We further note that, because counsel advocated for cross-examination on this issue, any error in admitting this testimony was likely invited. Under the invited error doctrine, errors that "were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." <u>State v. A.R.</u>, 213 N.J. 542, 561 (2013) (quoting <u>State v. Corsaro</u>, 107 N.J. 339, 345 (1987)). <u>See also</u> <u>Cotto</u>, 471 N.J. Super. at 534-35 (alteration in original) (quoting <u>Jenkins</u>, 178 N.J. at 358) (Under the invited error doctrine, "a 'defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his [or her] chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he [or she] sought and urged, claiming it to be error and prejudicial.'"). Defense counsel

A-1007-23

asked for cross-examination on the CSLI testimony and then incorporated that testimony in closing argument to bolster defendant's alibi.

We need not reach a determination regarding whether the error was invited, however, because the overwhelming evidence against defendant renders the admission of Chang's testimony harmless. Specifically, the jury heard Gross's testimony that he, Coombs, and defendant planned and orchestrated the shooting. Moreover, when shown the surveillance footage of the shooting at trial, Gross identified himself and defendant at Harris's door. Evidence was also presented at trial that defendant was a match for the blood found on the latex glove recovered from the SUV. On balance, the error in admitting Chang's testimony regarding CSLI does not warrant a new trial, given the overall strength of the prosecution's case. See Allen, 254 N.J. at 550.

VII.

Finally, we address defendant's contention that "the cumulative errors committed by the trial court denied [him] a fair trial and resulted in a manifest injustice." "[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). "Where the aggregation of legal errors renders a trial

unfair, a new trial is required." State v. T.J.M., 220 N.J. 220, 238 (2015). However, this principle does not apply "where no error was prejudicial and the trial was fair." Ibid. (quoting Weaver, 219 N.J. at 155).

Here, the only error relates to the admission of the CSLI testimony, and for reasons we have already explained, that error does not warrant reversal given the overwhelming evidence of defendant's guilt.

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1007-23